SCHUETTE v. BISHOP.

(Court of Civil Appeals of Texas. Amarillo. Jan. 25, 1913.)

1. TRIAL (§ 194*) — INSTRUCTIONS ON THE WEIGHT OF THE EVIDENCE.

An instruction that evidence as to certain matters could only be considered to throw light on whether there was a controversy between the plaintiff and defendant, the differences between them, if any, and as tending to explain, if it does, "the reason for the final difficulty between them on the 9th day of July," was a charge on the weight of the evidence, and was calculated to cause an improper judgment within rule 62a (149 S. W. x), providing that reversal be had for no other reason, where the evidence was conflicting whether there was any difficulty between them on that date.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441; Dec. Dig. § 194.*]

2. APPEAL AND ERROR (§ 1064*)—INSTRUCTIONS — HARMLESS ERROR — LIMITATION OF EVIDENCE.

Where the main issue was whether plaintiff voluntarily abandoned a farm or was evicted, an instruction that evidence as to an attempted arrangement of matters through third persons could only be considered to throw light on whether there was a controversy, and to show whether plaintiff voluntarily abandoned the premises, and for no other purpose, was an inappropriate limitation of the evidence and the last clause was confusing, but was not reversible error; the rule being that, where collateral facts are so connected with the main facts that they should not be excluded, they may be introduced to prove motive, system, guilty knowledge, or intent, if such elements enter into the main controversy, and ordinarily should be so limited.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. § 1064.*]

3. TRIAL (§ 252*) — INSTRUCTIONS — CROPS — ABANDONMENT.

In an action by a cropper against the landowner for part of the crop, the cropper having left the premises before the harvest, where the cropper's theory, if believed, showed threats sufficient to inspire a reasonable fear of personal injury, an instruction that the jury "could" conclude that such threats and acts were made to deprive the cropper of the premises was proper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

4. APPEAL AND ERROR (§ 1050*) — INVITED ERROR—EVIDENCE.

In an action by a cropper, who had left the premises before harvest, claiming eviction by threats, for his share of the crops, testimony of the cropper's wife that a daughter of the landowner threatened to shoot the cropper was inadmissible where no connection was shown with the landowner, but testimony of the landowner previously introduced that he knew nothing about the "racket" and had nothing to do with it rendered it not reversible.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

Appeal from Wilbarger County Court; J. A. Nabors, Judge.

Action by W. D. Bishop against Henry Schuette. Judgment for plaintiff, and defendant appeals. Reversed.

Berry & Stokes, of Vernon, for appellant. Storey & Warlick, of Vernon, for appellee.

HENDRICKS, J. The appellee, the plaintiff in the county court, was the tenant of appellant, cultivating the latter's land under a contract for a one-half share in the crop, and alleged that, before the expiration of tenancy, the appellant, the defendant in the trial court, in disregard of the contract, by force and threats, willfully and intentionally dispossessed and ejected him from the premises, and compelled him by such force and threats to abandon the same, and refused to permit him to re-enter, and that the defendant took possession and converted all the crops raised upon the place to his own use, plaintiff suing for a half interest in 10 bales of cotton and 5½ tons of cotton seed (disclaiming interest in the balance of the crop

for reasons not necessary to mention), and acknowledging certain deductions for money earned by himself and wife during the unexpired term of the lease, and further confessing a deduction of $50, cost of board for himself and wife during said time. The defendant, after denying the eviction of plaintiff, answered that the latter abandoned the crop in an immature condition, and that the same was grown up in weeds, and that some of the crop, at the time of abandonment, was not "laid by," and that he never returned to the premises to finish the necessary cultivation of the crops, or to gather the same, and that, when plaintiff left, he expressed his intention not to return, and that under the contract of tenancy plaintiff was to cultivate the crops in a "farmerlike" manner and gather the same and deliver to him a one-half thereof, free of expense, as his rental for the use of the land, and that, in violation of his contract of tenancy, he, plaintiff, voluntarily abandoned the premises and crops, and is estopped to claim damages.

First. Prior to the 9th day of July, 1910, there had been some difference between appellant and appellee as to the manner in which the crop was being worked by appellee, and hard feelings between the litigants had arisen, involving the use of the horses furnished by appellant to appellee, the consumption of the feed also furnished by appellant, and the testimony discloses a failure by appellant to furnish feed to the appellee for his teams after a certain time, except by daily delivery to the appellee's place, attempted to be justified by appellant on the ground of an improper use of the feed by others visiting at appellee's house, and other minor matters of difference are in evidence with reference to the cultivation of the crop, and some testimony of threats claimed by appellee to have been made by the appellant against him before the 9th day of July, 1910. The appellee in this case is the son-in-law of the appellant, and their places of residence were situated about 100 yards apart and the farms were adjoining. There was testimony that three disinterested neighbors had been sent by appellee to his father-in-law, the appellant, for the purpose of selling his interest in the crop, or to induce appellant to buy his, appellee's, interest, and, if appellant was not willing to buy or sell, for the emissaries to ascertain what the father-in-law was willing to do, who replied that he neither wanted to buy or sell, but was willing for his son-in-law to sell to any other third person, and he would furnish the teams, tools, and feed to complete the cultivation and gathering of the crop, and that he wanted a strict compliance with the contract. On the 9th day of July, 1910, young Schuette, the son of the appellant, was instructed by the latter to go to Bishop's, the appellee's, for a pair of harness lines, and at this time the appellant, his wife and son, were cutting corn and stalks in the field adjoining, the former using a butcher knife for that purpose, and the son-in-law was at his place about 100 yards away, and upon the son's arrival and after the request for, and the delivery of, the lines, words arose between son and son-in-law to the effect that each had been talking about the family of the other, when appellee shot at young Schuette. The testimony is in a sense conflicting between the son-in-law and the neighbor who was present, the latter testifying that the boy had no gun, and had turned to start back to the place where his father was cutting corn; Bishop, the appellee, contending that the boy started to draw a pistol from the inside of his "jumper," and also testifying that he saw his father-in-law coming at him "just as the shooting began or maybe a little before," and was running at him, and had a butcher knife in his hand. The defendant testified that he had the butcher knife while he was cutting corn, but had handed it to his wife, who had started to the house, and when he started to the scene of the difficulty, it was for the purpose of keeping his boy from getting hurt, and stopping Bishop from shooting at him, but not for the purpose of taking part in the fight. The neighbor, who was the only other eyewitness on the stand, testifying that "Mr. Schuette ran at Bishop like he was awfully mad," but that he saw no knife. Appellee also testified that Mrs. Doneheime, a daughter of the appellant, and who was living with the latter at the time ran out with a gun, and discharged it, and that subsequent events were of no further interest. He left and did not return. This difficulty on the 9th day of July, 1910, was the culmination—the main incident around which this case to a certain extent revolves; and it is argued by appellee in his brief that it was a prearranged affair, which is denied by the appellant, and enough of the testimony is reviewed by us to show that a serious conflict prevails as to the appellant's participation in it as a real belligerent.

[1] Second. The appellee assails the fifth paragraph of the court's main charge, asserting that the trial court assumed in said charge that the difficulty had occurred between appellant and appellee when it was a disputed issue of fact between them to be decided by the jury. The charge complained of is as follows: "The evidence relative to the attempted arrangement of matters between plaintiff and defendant by persons testified about and spoken of as arbitrators can be considered by you only for the purpose of illustrating and throwing light upon the question of whether or not there was a controversy between the said parties plaintiff and defendant, the differences between them, if any, and as tending to show and explain, if it does, *the reason for the final difficulty between them on the 9th day of July, 1910;* also for the purpose of showing whether or not plaintiff voluntarily abandoned said premises, and may be considered by you for no other pur-

pose." (The underscoring is ours.) We are unable to disagree with the appellant, and this assignment will have to be sustained. The portion of the charge complained of is without ambiguity in its statement, and the very statement of it declares the assumption of a fact, which the evidence detailed shows is a controverted one and should have been left to the jury; and by no process of justifiable reason or grammatical construction are we able to say with appellee that, when the charge is taken as a whole, there is no such fact assumed. Neither are we able to apply rule 62a (149 S. W. x) to this character of a charge in this kind of a case where the charge and the error in it complained of is a plain violation of the statute, which requires the court "to submit all controverted questions of fact solely to the decision of the jury," and directly prohibits him from charging "on the weight of the evidence"; a different case and a different charge from that presented in the cause of the Southern Kansas Railway Co. v. Shinn, 153 S. W. 636, presented and decided at this term of court, and the rule administered, holding that the error, if any presented, was not one that caused, or probably caused, the rendition of an improper judgment in the case.

[2] Third. The appellant insists that the limitations made in the charge quoted above, for the purpose for which the jury were to consider the testimony, constituted error, and the jury should be allowed to consider the testimony of the third parties attempting to conduct the negotiations for all purposes. Collateral facts, when so connected with the main facts as they should not be excluded, may be introduced for the purpose of proving motive, system, guilty knowledge, or intent, if such elements enter into the main controversy; and ordinarily should be limited, also testimony for the purpose of impeachment. Necessarily there was a controversy, and there were differences between the parties; and in this case an assertion of eviction by force and threats upon the one hand, and a voluntary abandonment upon the other, are the real issues involved, and hence the limitation in such general language could have been of no benefit to the jury, and coupled with the statement that they could consider the testimony on the issue of voluntary abandonment, which was a main issue, might have been confusing. The testimony of the agents of appellee may tend to prove, for his benefit, that he wanted to settle the differences with appellant and sever his business relations with him, and, on the other hand, for the benefit of appellant, that all that he wanted was a compliance with his contract, and that he was willing to do anything, even to the extent of permitting a sale to third parties, to obtain that end. This character of evidence, if properly in the record, as to matters evidentiary of the main facts, should not be limited, unless it is such testimony as comes within the

purview of the general rule, with reference to intent, etc., considered in our opening statement. We would not have reversed this case upon this question, but in the condition of this evidence suggest an inappropriate limitation because we reverse the case, in view of another controversy in the court below.

[3] Fourth. We think the charge of the court was proper, where he instructed the jury, in effect, that if the plaintiff was compelled to leave the premises and kept away from the same because of a reasonable fear of injury to himself, for the reason that it was tantamount to an eviction, and without advancing any statement as to the truthfulness of any testimony, or the credibility of any witness, it is sufficient to say that if the jury believed appellee's theory, as to threats and acts, they "were of such a grave and permanent character" in a legal sense, as to inspire a reasonable fear of personal injury to himself to actuate him to leave and not return, and the jury could conclude (without our intimating that they should or should not) that such acts and threats were made for the purpose of depriving appellee of the use of the demised premises.

[4] Fifth. The appellant urges that the testimony of Mrs. Bishop, the wife of appellee, to the effect that Mrs. Doneheime, about the middle of June, prior to the principal difficulty, on the 9th day of July, threatened the life of appellee, was highly prejudicial in its nature, and inadmissible, because the threats were not made in appellant's presence, or acquiesced in or authorized by him. The bill of exception supporting this assignment, standing alone, would be good; but the appellant "rather opened the way" by denying prematurely before any such testimony had been introduced, if this record properly reflects the testimony and its order, that he knew nothing about Mrs. Doneheime going down to appellee's house and having a "racket" with him and threatening to shoot him, and further says he had nothing to do with it, "either before or after it happened." His denial is susceptible of the construction that the language was used, and is rather an admission of the reality of the occurrence. To deny beforehand and anticipate testimony, unless it is of a main fact, put directly in issue by the pleadings of plaintiff or defendant, is not the proper order of testimony, and is sometimes confusing to a court or jury. The evidence of Mrs. Bishop of itself, of course, is not admissible unless some connection of the defendant is shown, authorizing or acquiescing in the statement. Neither would we reverse this case upon this point in the condition this record is in, and merely advert to it in view of another trial.

For the error indicated, as to the charge on the weight of the testimony, we reverse and remand this case, and it is so ordered.

HALL, J., not sitting.